# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ANDREW J. MAUER, on behalf of himself, the Eastman Kodak Employees' Savings and Investment Plan and a class of persons similarly situated, | : : : : | CLASS ACTION |
| | : | |
| Plaintiff, | : | COMPLAINT UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) FOR BREACH OF FIDUCIARY DUTY |
| v. | : | |
| | : | |
| The Eastman Kodak Savings and Investment Plan Committee, The Kodak Employee Stock Ownership Plan Committee, John Does 1-20, Richard S. Braddock, Herald Y. Chen, Adam H. Clammer, Timothy M. Donahue, Michael J. Hawley, William H. Hernandez, Douglas R. Lebda, Kyle P. Legg, Delano E. Lewis, William G. Parrett, Antonio M. Perez, Joel Seligman, Dennis F. Strigl, Laura D'Andrea Tyson, Frank S. Sklarsky, Antoinette P. McCorvey, Paul Dils, and BNY Mellon Financial Corporation, | : : : : : : : : : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |
| | : | |

## COMPLAINT

Plaintiff, Andrew J. Mauer ("Plaintiff"), individually, as a representative of Eastman Kodak Employees' Savings and Investment Plan (the "SIP") and the Kodak Employee Stock Ownership Plan (the "ESOP Plan") (collectively, the "Plans"), and, to the extent appropriate, on behalf of a class of similarly situated participants in the Plans (the "Participants"), by his attorneys, alleges the following for his Complaint ("Complaint"):

## NATURE OF THE ACTION AND SUMMARY OF CLAIMS

1.      Plaintiff, a Participant in the both Plans, brings this action concerning Plan investment in the stock of The Eastman Kodak Company ("Kodak" or "the Company"), individually and as a representative of the Plans and, to the extent appropriate, on behalf of a class of all Participants in the ESOP Plan and all Participants in the SIP for whose individual accounts the SIP invested in the Kodak Stock Fund (the "Fund"), from January 1, 2010 through and including the present (the "Class Period").  Plaintiff brings this action against the fiduciaries of the Plans pursuant to § 502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2)and (3).

2.      As more fully set forth below, Defendants breached their fiduciary duties owed to the Plans and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550.  As a result of these breaches, Defendants are liable to the Plans for all losses resulting from each such breach of fiduciary duty.  Plaintiff also seeks equitable relief.

3.      Plaintiff alleges that it was imprudent to (1) permit the SIP to offer the Fund as an investment option, (2) permit the SIP to invest in the Fund, and (3) permit the Fund and the ESOP to invest in, and remain invested in, Company stock, because objective, public

information revealed that the Fund, the ESOP and Company stock were extremely risky investments which were inappropriate for the investment of retirement assets.  Specifically, Kodak's financial condition – as set forth in detail below – had deteriorated to the point that, by the start of the Class Period, Defendants knew or should have known that the Company was in "dire circumstances."

4.      In addition to the imprudent investment claims, Plaintiff further alleges that those Defendants who had a duty to appoint and monitor the fiduciaries with authority or control over the management or disposition of the Plans' assets breached their duty to appoint and monitor.

5.      Plaintiff alleges that each Defendant is also liable as a co-fiduciary.

## JURISDICTION AND VENUE

6.      Plaintiff's claims arise under and pursuant to ERISA § 502, 29 USC § 1132.

7.      This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is the district where the Plans are administered, where the breaches took place and where one or more Defendants reside or may be found.

## THE PARTIES

### *The Plaintiff*

9.      Plaintiff Andrew J. Mauer was a participant in both Plans and maintained an investment in the Kodak stock in his individual Plan accounts during the Class Period.

### *The Eastman Kodak Company*

10.     Kodak is a New Jersey Corporation with its principal executive offices in Rochester, NY.  According to its public filings, Kodak is the world's foremost imaging innovator

and generates revenue and profits from the sale of products, technology, solutions and services to consumers, businesses and creative professionals.  Kodak is the Sponsor of the Plans and, on information and belief, a de facto fiduciary of the Plans.  Kodak is not a Defendant because it filed for bankruptcy.

*The SIPCO Defendants*

11.     According to the SIP Document,[1] Defendant Savings and Investment Plan Committee ("SIPCO") is the Plan Administrator and Named Fiduciary of the SIP.  SIPCO also has the duty to appoint and monitor the trustee.  On information and belief, SIPCO is an unincorporated association of the Company.  SIPCO's members performed all of the duties of SIPCO.

12.     On information and belief, SIPCO's members were all top level Kodak employees administering the SIP in the regular course of their employment.  Kodak's Chief Financial Officer chaired SIPCO during the Class Period.  Defendant Frank S. Sklarsky ("Sklarsky") served as Chair of SIPCO and signed the SIP's Annual Report on Form 11-K for the year ending December 31, 2009.  Sklarsky was the Company's CFO from November 13, 2006 until November of 2010, when he was replaced as CFO by Defendant Antoinette P. McCorvey ("McCorvey").  As CFO, McCorvey was Chair of SIPCO and signed the SIP's Annual Report for the year ending December 31, 2010.  According to Kodak's public filings, the CFO was responsible for Kodak's worldwide financial operations, including Corporate Financial Planning and Analysis, Treasury, Audit, Controllership, Tax, Investor Relations, Aviation, Corporate Business Development, Worldwide Information Systems, and Global Purchasing.

---

[1] "SIP Document" refers to the document titled "Eastman Kodak Employees' Savings and Investment Plan."

13.     John Does 1-10 were the individual members of SIPCO and members of any other committee(s) which administered the SIP.  The identity of the other members of SIPCO, and of any other committee(s) which was or were responsible for carrying out the provisions of the SIP, is currently not known.  Upon information and belief, John Does 1-10 are senior executive officers of the Company who knew or should have known the facts alleged herein. The SIPCO John Does 1-10 and McCorvey and Sklarsky are hereafter collectively referred to as the "SIPCO Defendants."

***The ESOP Committee Defendants***

14.     According to the Form 5500 filed by Kodak, the Stock Ownership Plan Committee ("ESOP Committee") was the Plan Administrator and named fiduciary of the ESOP.

15.     Defendant Paul Dils ("Dils") signed the Form 5500 as on behalf of the ESOP Administrator for the years ending December 31, 2009 and December 31, 2010.  On information and belief, Defendant Dils served as Kodak's Chief Tax Officer and Vice President of the Company's Corporate Finance Group.

16.     John Does 11-20 were the individual members of the ESOP Committee and members of any other committee(s) which administered the ESOP.  The identity of the other members of the ESOP Committee, and of any other committee(s) which was or were responsible for carrying out the provisions of the ESOP, is currently not known.  Upon information and belief, John Does 11-20 are senior executive officers of the Company who knew or should have known the facts alleged herein.  The ESOP John Does 11-20 and Dils are hereafter collectively referred to as the "ESOP Committee Defendants."

***The Board of Directors Defendants***

17.     Defendants Richard S. Braddock, Herald Y. Chen, Adam H. Clammer, Timothy M. Donahue, Michael J. Hawley, William H. Hernandez, Douglas R. Lebda, Kyle P. Legg, Delano E. Lewis, William G. Parrett, Antonio M. Perez, Joel Seligman, Dennis F. Strigl and Laura D'Andrea Tyson (collectively, "Board Members") were members of Kodak's Board of Directors during some or all of the Class Period alleged herein.  According to the SIP Document, the Board Members appointed SIPCO, and on information and belief, the Board also appoints the Administrator for the ESOP.

***The Trustee Defendant***

18.     According to the SIP Annual Report, Defendant BNY Mellon Financial Corporation is the trustee of the SIP ("Trustee").  According to the SIP Document, the Trustee had the duty to manage the Fund.  Upon information and belief, BNY Mellon Financial Corporation is also a fiduciary of the ESOP because it managed the Company stock held by ESOP.  On information and belief, the Trustee is a wholly owned subsidiary of BNY Mellon Corporation with its principal place of business is 1 Wall Street, New York, NY 10286.

<u>**DESCRIPTION OF THE PLANS**</u>

19.     At all times relevant to this Complaint, the Plans were employee benefit plans within the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

20.     At all times relevant to this Complaint, the Plans were "defined contribution" or "individual account" plans within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34), in that the Plans provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and

losses, and any forfeitures of accounts of other Participants which could be allocated to such

Participant's accounts.

21.     The stated purpose of the SIP "is to assist Employees of the Company in an

orderly and systematic savings and investment program…." SIP Document Sec. 1.01

22.     Another purpose of the SIP was that it be managed in accordance with the

interests of participants and beneficiaries. According to SIP Document Sec. 3.08:

> All fiduciaries under the Plan and Trust will act solely in the interests of the Participants
> and their beneficiaries and in accordance with the terms and provisions of the Plan and
> Trust insofar as such documents are consistent with ERISA, and with the care, skill,
> prudence, and diligence under the circumstances then prevailing that a prudent person
> acting in a like capacity and familiar with such matters would use in the conduct of an
> enterprise of a like character and with like aims.

23.     At all times relevant to this Complaint, the SIP provided that Participants could

direct portions of their salaries into the SIP.  The SIP's Annual Report states:

> The Plan includes a salary reduction provision allowing eligible Kodak participants to
> defer up to a certain percentage of eligible compensation as defined in the Plan.  The
> maximum deferral for Plan years 2010 and 2009 was limited to 75% of the aggregate of
> eligible salary and certain related incentive compensation.

24.     Kodak also made matching contributions to Participant accounts.  The SIP's

Annual Report states:

> Efective January 1, 2000, the Company began to match SIP contributions for an amount
> up to 3% of wages for employees who contributed up to 5% of their wages to SIP and
> who also participated in the Cash Balance Plus portion of the Kodak Retirement Income
> Plan.  Effective January 1, 2009, the Company suspended its matching contributions.
> Effective January 1, 2010, the Company reinstated the matching contributions.  Company
> match funds cannot be used for loans or hardship withdrawals.

25.     The SIP provided for a number of different options for investment of the SIP's

assets, including the Fund, and Participants were allowed to direct the SIP to make investments

from among the investment options available under the SIP and allocate them to their individual

accounts.  The SIP's Annual Report states:

> Participants direct the investment of their contributions in 1% increments into various investment options offered by the Plan, which include common collective trusts, a stock fund, and a self-directed brokerage account.

26.     The SIP did not except or exclude the Fund from the SIP's purposes alleged

above or provide that a purpose of the SIP was to offer the Fund even if it was an imprudent and

unduly risky investment for retirement savings. Moreover, the SIP did not provide that the Fund

would be offered as an investment option, or that SIP assets should be invested in the Fund, if the

Fund was an unduly risky and imprudent investment option. Accordingly, as manifested by the

terms of the SIP, Kodak did not intend when it adopted and sponsored the SIP that SIP assets be

invested in the Fund when the Fund was an inappropriate investment for retirement savings.

27.     Upon information and belief, the ESOP was primarily invested in Company stock.

## DEFENDANTS WERE FIDUCIARIES

28.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plans

as defined by ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised

authority or control respecting management or disposition of Plan assets.

29.     The SIPCO Defendants were fiduciaries of the SIP.  Pursuant to the SIP

Document, SIPCO was the "Named Fiduciary" and the "Administrator" of the SIP as these terms

are used under ERISA.  SIP Document, Sec. 3.02.  SIPCO had the duty to administer the SIP and

the power necessary to carry out all provisions of the SIP.  SIP Document, Sec. 3.03.  In

particular, SIPCO had the power to appoint and remove the Trustee, and the power to administer

the SIP.  SIP Document, Sec. 3.10.

30.     In addition, SIPCO was a fund manager of the Kodak Stock Fund.  The information sheet titled "Kodak Stock Fund" available to Participants via the SIP Record Keeper's website at https://www3.troweprice.com/rws/rps/public/assets/internalffs/ KODAK.pdf states "The Savings and Investment Plan Committee (SIPCO); 343 State Street; Rochester, New York 14650-1112 (telephone number: 1-585-724-4800) is the fund manager."

31.     The ESOP Defendants were fiduciaries of the ESOP Plan.  According to the Form 5500 filed on behalf of the ESOP, the ESOP Committee was the Administrator and Named Fiduciary for the ESOP.  On information and belief, the ESOP Defendants had the duty to administer the ESOP and the powers necessary to carry out all of the provisions of the ESOP.

32.     The Board Members were fiduciaries because they were responsible for appointing and monitoring SIPCO and the ESOP Committee.  SIP Document, Sec. 3.01, 3.10.

33.     The Trustee was a fiduciary because it was responsible for the management and disposition of Plan assets, including the Fund.  According to the SIP Document Sec. 3.19, the Trustee had the duty to "maintain within the Trust" the "Kodak Stock Fund" which "will consist almost entirely of common stock of Eastman Kodak Company."  Additionally, the Trustee was authorized to "keep" a portion of the Fund "as it deemed advisable from time to time in cash or liquid investments."  SIP Document Sec. 7.02.  Consequently, the Trustee was vested with the authority to sell Kodak stock held by the Fund at any time it became "advisable," including when Kodak stock became an imprudent investment as alleged below.

### DEFENDANTS' FIDUCIARY DUTIES

34.     **The SIP Requirements:**  According to SIP Document Sec. 3.08:

All fiduciaries under the Plan and Trust will act solely in the interests of the Participants and their beneficiaries and in accordance with the terms and provisions of the Plan and Trust insofar as such documents are consistent with ERISA, and with the care, skill,

prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

35.    Additionally, as alleged above, the Trustee also had duty to exercise discretion to hold cash in lieu of Company stock on behalf of the Plans when advisable.

36.    **The Statutory Requirements**.  ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

37.    **The Duty of Loyalty**.  ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . .  providing benefits to participants and their beneficiaries . . . ."

38.    The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.   A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

39.    **The Duty of Prudence.**  Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence – that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence

10

under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

40.     **The Duty to Investigate and Monitor Investment Alternatives.**  With respect to a pension plan such as the Plans, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plans including employer securities, to ensure that each investment is a suitable option for the Plans.

41.     **The Duty to Monitor Appointed Fiduciaries.**  Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus appointed.  The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries.  In a 401(k) plan such as the Plans the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

    a.     possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

    b.     are knowledgeable about the operations of the Plans the goals of the Plan and the behavior of Plans' participants;

    c.     are provided with adequate financial resources to do their jobs;

    d.     have adequate information to do their jobs of overseeing the Plan investments with respect to company stock;

    e.     have access to outside, impartial advisors when needed;

    f.     maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and

g.      report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands

on fiduciaries.

42.      **The Duty Sometimes to Disregard Plan Documents.**  A fiduciary may not

avoid his fiduciary responsibilities by relying solely on the language of the plan documents.

While the basic structure of a plan may be specified, within limits, by the plan sponsor, the

fiduciary may not blindly follow the plan document if to do so leads to an imprudent result.

ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

43.      **Co-Fiduciary Liability**.  A fiduciary is liable not only for fiduciary breaches

within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances.

ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances
>
> (1)      if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)      if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)      if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

44.      **Non-Fiduciary Liability**.  Under ERISA, non-fiduciaries who knowingly

participate in a fiduciary breach may themselves be liable for certain relief under ERISA

§ 502(a)(3), 29 U.S.C. § 1132(a)(3).

## BACKGROUND

45.     Kodak was for decades the "blueist" of the blue chip companies.  From 1930 to 2004, it was included in the Dow Jones Industrial Average.   Kodak's business had for decades been based on the film industry.  However, as the market changed and customers abandoned film for digital technology, Kodak suffered dramatically.  Since 1999, Kodak stock has lost approximately 99% of its value – the stock that once traded at over $80 per share was trading between $4 and $5 per share in January of 2010.

46.     Kodak posted only one annual profit since 2004 and was losing money almost every quarter.

47.     In response, to these pressures, Kodak began a costly reorganization plan which involved a transformation to the digital environment.  In particular, the Company began to focus on the print industry and digital photography.  The success of the reorganization was highly dependent on revenues from the licensing of Kodak's intellectual property portfolio to finance the transformation.

48.     By the beginning of 2010, Kodak had ceased production of all but a few of its films, but had failed to establish a foothold in the digital camera market.  The result was rapidly declining sales, falling share prices, ballooning quarterly losses and dire financial straits for the Company.

49.     Further eroding Kodak's ability to continue as a going concern, the Company was burning through cash at an astonishing rate.  For instance, in January 2011, Kodak had $1.6 billion in cash.  Six months later, it had under $960 million.

50.     In effort to sustain its operations, Kodak announced a strategy whereby it intended to sell parts of its 1,000 patent portfolio to generate cash through Lazard LLC.  It was estimated that Kodak's patent portfolio was worth more than the company itself.

51.     Eventually, Kodak's patent sale strategy was called into question when patent expert Alexander Poltorak told TheStreet.com that valuable patents typically sold between $200,000 and $250,000 each, which would mean that Kodak's patent sale could garner only approximately $250 million.  *See TheStreet.com, Apple, Google, RIMM; Kodak's Patent Buyers*, October 10, 2011. www.thestreet.com/print/story/11272680.html.

52.     Poltorak's estimated value of Kodak's patent portfolio was dramatically below the approximately $3 billion valuation some analysts gave to the portfolio.

53.     As Kodak drew upon revolving credit lines, it became apparent that the Company was not only burning through cash at an accelerating rate, but  it appeared likely that Kodak would not be able to sell off its patent portfolio before it ran out of cash.  According to Scott Dinsdale, an analyst at KDP Investment Advisors, "They could run out of cash in early 2012."

54.     By the fourth quarter of 2010, Kodak was blaming its 25% drop from year earlier results in digital revenue on lower intellectual property licensing revenues and industry-related pricing pressures.   It was clear that Kodak's business model had completely failed.

55.     Kodak's credit ratings for debt instruments, which would have priority in bankruptcy over stockholders, demonstrate Kodak's dire circumstances.  Over the course of the entire Class Period, Kodak's debt ratings were never investment grade, and they deteriorated from "highly speculative" to "extremely speculative" to "in default with little prospect for recovery."

14

Simplified Rating Agency Guidelines

Kodak Credit Ratings*

| Moody's | S&P | Fitch | |
|---------|-----|-------|---|
| Aaa | AAA | AAA | Prime |
| Aa1 | AA+ | AA+ | High Investment Grade |
| Aa2 | AA | AA | |
| Aa3 | AA- | AA- | |
| A1 | A+ | A+ | Upper Medium Investment Grade |
| A2 | A | A | |
| A3 | A- | A- | |
| Baa1 | BBB+ | BBB+ | Lower Medium Investment Grade |
| Baa2 | BBB | BBB | |
| Baa3 | BBB- | BBB- | |
| Ba1 | BB+ | BB+ | Non Investment grade Speculative |
| Ba2 | BB | BB | |
| Ba3 | BB- | BB- | |
| B1 | B+ | B+ | Highly Speculative |
| B2 | B | B | |
| B3 | B- | B- | |
| Caa1 | CCC+ | CCC | Substantial risks |
| Caa2 | CCC | | Extremely speculative |
| Caa3 | CCC- | | In default with little prospect for recovery |
| Ca | CC | | |
| / | D | DDD | In default |

**Moody's**:

> 2/10/2009 cut from B1 to B3
> 3/3/2011 cut from B3 to Caa1
> 9/27/2011 cut from Caa1 to Caa3

**S&P**:

> 3/5/2009 cut from B to B-
> 2/28/2011 cut from B- to CCC

**Fitch:**

> 1/30/2009 cut from B to B-
> 2/24/2011 cut from B- to CCC
> 9/28/2011 cut from CCC to CC

* as reported via Bloomberg database "EK US EQUITY CRPR"

15

56.     It was clear that Kodak was rapidly heading towards bankruptcy.  The probability of a company entering bankruptcy can be calculated using a financial analytical tool called an Altman Z-score ("Z-score"). The Z-score formula for predicting bankruptcy is a multivariate formula that measures the financial health of a company and predicts the probability of bankruptcy within two years.  A score above 3 demonstrates bankruptcy is not likely and a score below 1.8 demonstrates bankruptcy is likely.  Studies measuring the effectiveness of the Z-score have shown the model to be accurate in greater than 70% of its applications.  Kodak's Z-Score was below 1.8 every quarter from the beginning of the Class Period as reported via Bloomberg database "EK US EQUITY AZS":

| Date | Z-Score* |
| --- | --- |
| 12/31/2009 | 1.148 |
| 03/31/2010 | 1.682 |
| 06/30/2010 | 1.646 |
| 09/30/2010 | 1.67 |
| 12/31/2010 | .6412 |
| 03/31/2011 | .1027 |
| 06/30/2011 | 0.029 |

57.     The credit ratings issued by Moody's, S&P and Fitch along with analytical tools such as the Altman Z-Score are regularly used by investors to measure investment risk.  Such tools should have apprised Defendants of the extraordinary risk associated with investing SIP and ESOP Plan assets in Kodak stock.

## SUBSTANTIVE ALLEGATIONS

58.     As of January 1, 2010, Kodak's debt was no longer being rated as investment grade by any credit rating agency, and the Company's Z-score was rated only 1.14 on December 31, 2009, which indicated that bankruptcy was likely.

59.     On January 28, 2010, Kodak announced a Company loss of $232 million, or $0.87 per share for 2009.

60.     On February 25, 2010, Bloomberg News reported that Kodak 9.75 Notes had fallen 0.22 cents on the dollar.

61.     On April 29, 2010, the Company forecasted a loss of as much as $150 million from continuing operations for the full year, causing Company shares to plunge 17%.

62.     On July 28, 2010, Kodak reported a second quarter loss of $0.51 per share, a wider loss than consensus estimates, for a loss of $0.32 per share.  The Company also announced that revenues had fallen 11% year-over-year to $1.77 billion.

63.     On July 29, 2010, Citigroup, Inc. lowered its price target on Kodak from $5 to $4 while maintaining its "sell" rating.

64.     A July 30, 2010 Bloomberg article entitled "Kodak's Turnaround Story Getting Old" reported that shares of Kodak had dropped 50% since April, reducing its market cap to below $1.2 billion.  The article also noted that "a group of analysts at Standard & Poor's has placed the Company atop its list of likely targets for leveraged buyouts in 2010."

65.     On October 28, 2010, the Company filed with the SEC a Company press release on Form 8-K, announcing its third-quarter 2010 results that reflect losses from continuing operations of $43 million, or $0.16 per share.

66.     On December 10, 2010, the price of Kodak stock had declined so far that it was removed from the S&P 500 index.  Shortly thereafter, on December 31, 2010, Kodak's Z-score fell to 0.6412, approximately 65% below the level at which bankruptcy was likely.

67.     On January 26, 2011, Kodak reported its earnings for the fourth quarter of 2010 on a Form 8-K announcing its 2010 results which reflected revenues for the fourth quarter of

2010 of $1.927 billion, a 25% decrease from the year-ago quarter. The release also reflected earnings from continuing operations of $33 million, compared with earnings on the same basis of $430 million, in the year-ago period, reflecting primarily lower intellectual property licensing revenues for the fourth quarter of 2010.

68.     The response of the investment community was negative. Under the heading "Fundamentals deteriorate further," Chris Whitmore from Deutsche Bank, in a report dated January 26, 2011, described Kodak's "core business as challenged and under severe secular pressure." He also noted that Kodak "burned" approximately $1 billion in cash in 2010 and that the risk to Kodak of being able to monetize IP payments "to offset severe losses in other businesses" had increased dramatically. Deutsche Bank maintained its "sell" rating.

69.     A Reuters article dated January 27, 2011 entitled "Kodak's Shares Plummet After a Negative Earnings Report" stated that "Kodak has suffered as people abandoned printed film for digital cameras."

70.     Soon thereafter, Kodak held an "analyst day" at which it discussed the prospects of the company with securities analysts. It was described by Deutsche Bank as "uninspiring." In particular, in a report dated February 3, 2011, Deutsche Bank cut Kodak's revenue and earnings estimates again and maintained its sell rating. It noted that "underlying cash burn appears set to continue."

71.     The downward trend continued when Kodak announced a second quarter loss of $.67 per share, a decline of 5% as compared to the prior year.

72.     On February 24, 2011, Fitch cut Kodak's credit rating from B- to CCC.

73.     By March 31, 2011, Kodak's Z-score had fallen again to only 0.1027, less than 10% of the level at which bankruptcy was likely.

74.     On April 28, 2011, the Company filed with the SEC its first-quarter 2011 results ("1Q 2011 Form 10-Q").  The Company's 1Q 2011 Form 10-Q further stated in relevant part:

> Revenue and profitability for the quarter as compared with the prior year quarter declined primarily due to a non-recurring intellectual property licensing arrangement in the first quarter of 2010 and were also negatively impacted by secular volume declines and increased commodity costs, particularly silver, in the Film, Photofinishing, and Entertainment Group (FPEG) segment.

75.     By the end of June 2011, the Company had liabilities exceeding its assets by $1.4 billion. Further, the Company's stock price had lost over three-quarters of its value since the start of 2011. Moreover, the Z-score and fallen to an incredibly low 0.029.

76.     On July 26, 2011, the Company filed with the SEC a Company press release on a Form 8-K, announcing its second-quarter 2011 results that reflected a second quarter loss from continuing operations of $179 million, or $0.67 per share, compared with a $167 million dollar loss on the same basis for the same year ago period.  This was Kodak's fifth consecutive quarter of losses.

77.     On July 27, 2011, The Wall Street Journal noted that Kodak burned through $300 million in cash in the second quarter and that "the results highlighted the challenges that remain as the company seeks to refocus its operations around commercial and consumer printing." Kodak's CEO was quoted as saying that the challenges facing the company were so enormous that they were "the challenges typical in the creation of new businesses."  In other words, Kodak ceased to be its former self and instead was a new and much riskier company that was in dire circumstances.

78.     The downward trend continued when Dow Jones Newswire reported on August 5, 2011, that Kodak might sell the company's patents and use the proceeds for general corporate

purposes and "stiff" the junk-bond holders whose bonds were secured by a security interest in Kodak's intellectual property.

79.     Then, on August 11, 2011, the Wall Street Journal noted in an article entitled "Kodak Struggles to Find Its Moment" that "[a]fter three decades of serial reorganizations, Eastman Kodak Co. is struggling to stay in the picture."  It stated that Kodak first lost most of its film business to foreign competitors, and "then mishandled the transition to digital cameras." "Now it is quickly burning through cash as it remakes itself into a company that sells printers and ink."

80.     Moreover, the August 11 article noted that Kodak bonds were selling "below 80% on the dollar, signaling the market sees a risk of default."  And, Deutsch Bank was quoted as saying, "[i]t was a disappointing quarter in cash-flow burn, topline growth and overall growth." "They are selling the family silver to keep the lights on."

81.     On September 1, 2011, Bloomberg Business Week reported that "fears about Kodak's viability threatened to overwhelm Chief Executive Officer Antonio M. Perez's efforts to rescue the iconic brand."

82.     On September 26, 2011, Reuters noted that Kodak drew $160 million on its line of credit, "raising concerns about cash flow generation and its ability to compete with digital rivals under the strategy set forth by CEO Antonio Perez."  In the article, KDP Asset Management was reported to have said that "Kodak's borrowing is an attempt to 'grab whatever is available' and could be a signal that the company is burning too much cash.  [It] added that the company could file for bankruptcy 'between now and 2012.'"

83.     Also on September 26, 2011, the Motley Fool suggested that Kodak "could use some tips from personal finance expert Suze Orman" because it "hasn't been managing its

budget very well and has been living paycheck to paycheck for a very long time, a tough habit to break." The article further stated that, "[u]nfortunately for Kodak, its paychecks and patent-trolling days are numbered."

84.     Similarly, Bloomberg reported on the next day that the borrowing "signals the 131-year-old camera maker is using cash at an accelerating rate, raising concern the company will be unable to sell a portfolio of patents before it runs out of money."  It further noted that, according to Argus Research Group, "[t]he company may be exacerbating its cash burn by shifting focus to inkjet printers and commercial presses."  KDP was quoted, in the article, as stating that Kodak "could run out of cash in early 2012."

85.     On September 27, 2011, Moody's downgraded Kodak's credit rating from Caa1 to Caa3.

86.     The next day, Fitch also downgraded Kodak's credit rating to CC indicating that there was an "insufficient" scale in Kodak's purported growth areas including consumer and commercial printing – the key portion of Kodak's turnaround effort.

87.     On September 28, 2011, CNNmoney.com published "Kodak: Death of an American Icon?" The article noted that the additional borrowing "pushed Kodak even deeper into 'junk' status." It further stated that Kodak is "one of the biggest money losers in the Fortune 500" and that "investors need to be extremely careful."  According to CNN, "[i]f there's any reason to be optimistic about Kodak, you have to look at its intellectual property." But, because of litigation before the International Trade Commission, "betting that Kodak may hit the patent jackpot is highly risky."

88.     On September 28, 2011 Moody's downgraded all of its debt ratings on Kodak citing "weakness in the company's core business operations" and "weaker cash flow prospects."

The ratings were lowered to "Caa2" from "Caa1" for probability of default rating and to "Caa3" from "Caa2" on its senior unsecured rating.  Both ratings were well into non-investment grade territory.

89.     On September 29, 2011, the Motley Fool reported that Investment Partners Asset Management, one of Kodak's institutional investors, called on other large institutional investors to "rally and enact change before it's too late," adding "the status quo cannot continue."

90.     On September 30, 2011, CNN reported that Kodak had hired the law firm of Jones Day "to explore a restructuring." According to the article, Bloomberg said "that bankruptcy is among the options being considered."

91.     On September 30, 2011, trading on the Company's Stock was temporarily halted. In a single day, the Company lost over 50% of its value before trading was halted.

92.     The next day, October 1, 2011, the New York Times reported that a "person briefed on the matter" said that "Kodak is considering filing for bankruptcy as it explores ways to lift its sagging fortunes…." In the same article, Cross Research was quoted as follows: "[W]e took the price target down to a dollar.  We were anticipating that the equity was virtually worthless."

93.     Also on October 1, The Wall Street Journal reported that one of Kodak's bonds "traded at 26 cents on the dollar."

94.     On October 6, 2011, Barron's reported that that Richard Gardner of Citigroup reiterated a sell rating on shares of Eastman Kodak, and cut his price target to $1 from $2, noting that it was becoming "increasingly doubtful" that Kodak would achieve intellectual property targets of $250-$350M this year.

95. On October 12, 2011, Bloomberg reported that creditors holding Kodak second-lien debt secured by Kodak's intellectual property had hired bankruptcy lawyers and restructuring advisors. According to the article, CRT Capital Group stated that "[t]his may come to a head soon as potential buyers are hesitant to do anything outside of bankruptcy which could lead to a cash crunch."

96. On October 20, 2011, the New York Times reported on analyst views of Kodak's attempt to transform "into a giant in the inkjet printer business, even as printouts are increasingly being replaced with electronic copies on computers, tablets and smartphones." According to Deutsch Bank, Kodak was "jumping 'from one buggy whip business to another.'"

97. On November 3, 2011, the Company announced its third-quarter 2011 results:

> The company reported a third-quarter loss from continuing operations of $222 million, or $0.83 per share, compared with a loss from continuing operations on the same basis of $43 million, or $0.16 per share, in the year ago period. The results largely reflect the absence of sizable patent licensing revenue in this year's third quarter versus the year-ago period and the continued secular decline of traditional products….

98. On November 8, 2011, Moody's said Kodak would run out of cash in 2012, stating that Kodak would be challenged "without first establishing a better liquidity position" to rectify what is now "precarious liquidity." Moody's called Kodak's efforts to pledge assets for new financing "akin to putting the last logs on the fire" since "new debt would likely consume the last few remaining forms of alternative financing."

99. On November 10, 2011, Legg Mason Capital Management, the largest institutional investor in Kodak stock, reported that it had sold off its last 19 million shares in Kodak. Legg Mason sold 11 million shares in the third quarter of 2011 and the remaining 7.9 million in October of 2011. *See WSJ: Legg Mason Sells Off Last 19 Million Shares In Kodak.*

100.     On January 3, 2012, the Company announced that it received a continued listing standards notice from the New York Stock Exchange ("NYSE") because the average closing price of the Company's Stock was less than $1.00 per share over a period of thirty (30) consecutive trading days.

101.     On January 4, 2012, The Wall Street Journal reported that Kodak shares had declined to $0.47 and that the Company might file for bankruptcy protection if it could not sell digital patents.

102.     On January 5, 2012, Moody's cut ratings on about $1 billion of Kodak's debt, citing "a heightened probability of a bankruptcy" as liquidity continued to deteriorate.

103.      On January 19, 2012, the Company announced that it and its U.S. subsidiaries filed voluntary petitions for Chapter 11 business reorganization in the U.S. Bankruptcy Court for the Southern District of New York.

104.     On January 20, 2012, the Daily Mirror reported that bankruptcy protection was a last-ditch move for the Company: "Kodak has already reorganized its business to focus on printers, but this has failed to restore profitability.  The Company has closed 13 manufacturing plants and 130 processing labs since 2003."

105.     On January 24, 2012, Kodak projected a $363.7 million cash loss over the thirteen weeks ending April 6, 2012, in a presentation to lenders.

106.     On February 9, 2012, Kodak said it would stop making digital cameras, pocket video cameras and digital picture frames and will license its brand to other manufacturers. According to an article in the Wall Street Journal, entitled "Kodak Shutters Camera Business," "the decision… is the strongest symbol yet of the sea change in consumer electronics and decades of missteps that forced the former-blue chip company to seek bankruptcy protection."

24

107.     Throughout the Class Period, Defendants took no action to protect the Plans' assets. Instead, Defendants imprudently allowed the Plans to continue offering Kodak Stock as an investment option and they continued to invest the Plans' assets in Kodak stock when it was no longer prudent to do so as a result of the Company's dire circumstances as alleged above.

## CAUSES OF ACTION

**Count I:  Failure to Prudently and Loyally Manage the Plan and Assets of the SIP**

108.     Plaintiff incorporates by reference the paragraphs above.

109.     This Count alleges fiduciary breach against all Defendants other than the Director Defendants and ESOP Committee Defendants (the "SIP Prudence Defendants").

110.     As alleged above, during the Class Period, the SIP Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

111.     As alleged above, the scope of the fiduciary duties and responsibilities of the SIP Prudence Defendants included managing the assets of the SIP for the sole and exclusive benefit of SIP Participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA.  The SIP Prudence Defendants were directly responsible for, among other things, selecting and offering only prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the SIP and directing the trustee regarding the same, determining how to invest Fund assets as "advisable," evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the SIP assets were invested prudently.

112.     According to United States Department of Labor ("DOL") regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, and (b) he has acted accordingly.

113.     The SIP Prudence Defendants were obliged to prudently and loyally manage all of the SIP assets.  However, their duties of prudence and loyalty were especially significant with respect to Company stock because: (a) company stock is a particularly risky and volatile investment; and (b) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.

114.     The SIP Prudence Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of investing Plan assets in the Fund and Fund assets in Company stock, but had no such procedure.  Moreover, they failed to conduct an appropriate investigation of the merits of continued investment in the Fund or Company stock.  Given the widespread public disclosure of Kodak's dire circumstances, such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to offer the Fund as an investment option or make and maintain investment in the Fund and/or Company stock under these circumstances.

115.     Contrary to their duties and obligations under the SIP Documents and ERISA, the SIP Prudence Defendants failed to loyally and prudently manage the assets of the SIP.  Specifically, during the Class Period, these Defendants knew or should have known that Kodak

stock was no longer a suitable and appropriate investment for the SIP, but was, instead, an imprudent investment in light of widely available public information.

116.    Nonetheless, during the Class Period, these Defendants continued to permit the SIP to offer Kodak stock as an investment option and continued to permit the SIP to invest in Company stock.  They did so despite the fact that they knew or should have known that Kodak was in dire circumstances.

117.    The SIP Prudence Defendants breached their fiduciary duty respecting the SIP's investment in Company stock described above, under the circumstances alleged herein, in that a prudent fiduciary acting under similar circumstances would have made different investment decisions and, in particular, would not have permitted the SIP to invest in Kodak stock.

118.    Given the information described above, the SIP Prudence Defendants could not possibly have acted prudently when they continued to offer the Fund or invest the SIP's assets in Company stock because, among other reasons:

   a.   The SIP Prudence Defendants knew of and/or failed to investigate the Company's dire circumstances as alleged above;

   b.   The risk associated with the investment in Company stock during the Class Period was by far above and beyond the normal, acceptable risk associated with retirement plan investment in company stock.

119.    Knowing of this extraordinary risk, the SIP Prudence Defendants had a duty to avoid permitting the SIP or any Participant from investing the SIP's assets in Company stock.

120.    Further, knowing that the SIP was not adequately diversified, but was heavily invested in Company stock, the SIP Prudence Defendants had a heightened responsibility to divest the SIP of Company stock when it was imprudent.

121.    The SIP Prudence Defendants breached their fiduciary duties by, inter alia, failing to engage independent advisors who could make independent judgments concerning offering Company stock as an option or the SIP's investment in Company stock; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Company stock an unsuitable investment for the SIP; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to the Company's dire circumstances; and by otherwise placing their own and the Company's improper interests above the interests of the Participants with respect to the SIP's investment in Company stock.

122.    As a consequence of the SIP Prudence Defendants' breaches of fiduciary duty alleged in this Count, the SIP suffered tremendous losses.  If the SIP Prudence Defendants had discharged their fiduciary duties to prudently invest the SIP's assets, the losses suffered by the SIP would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the SIP, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

123.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the SIP Prudence Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**Count II:  Failure to Prudently and Loyally Manage the Plan and Assets of the ESOP**

124.    Plaintiff incorporates by reference the paragraphs above.

125.    This Count alleges fiduciary breach against all Defendants other than the Director

Defendants and SIP Defendants (the "ESOP Prudence Defendants").

126.    As alleged above, during the Class Period, the ESOP Prudence Defendants were

named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries

within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were

bound by the duties of loyalty, exclusive purpose, and prudence.

127.    As alleged above, the scope of the fiduciary duties and responsibilities of the

ESOP Prudence Defendants included managing the assets of the ESOP for the sole and exclusive

benefit of ESOP Participants and beneficiaries and with the care, skill, diligence, and prudence

required by ERISA.  The ESOP Prudence Defendants were directly responsible for, among other

things, selecting and offering only prudent investment options, eliminating imprudent options,

and directing the trustee regarding the same, determining how to invest ESOP assets and

directing the Trustee regarding the same, and evaluating the merits of the ESOP Plan on an

ongoing basis.

128.    According to DOL regulations and case law interpreting this statutory provision, a

fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate

consideration to those facts and circumstances that, given the scope of such fiduciary's

investment duties, the fiduciary knows or should know are relevant to the particular investment

or investment course of action involved, and (b) he has acted accordingly.

129.    The ESOP Prudence Defendants were obliged to prudently and loyally manage all

of the ESOP assets.  However, their duties of prudence and loyalty were especially significant

with respect to Company stock because: (a) company stock is a particularly risky and volatile

investment; and (b) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.

130.     The ESOP Prudence Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of investing in the Company stock, but had no such procedure.  Moreover, they failed to conduct an appropriate investigation of the merits of continued investment in the Company stock.  Given the widespread public disclosure of Kodak's dire circumstances, such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to offer Company stock as an investment option or make and maintain investment in Kodak stock under these circumstances.

131.     Contrary to their duties and obligations under the ESOP documents and ERISA, the ESOP Prudence Defendants failed to loyally and prudently manage the assets of the ESOP. Specifically, during the Class Period, these Defendants knew or should have known that Kodak stock was no longer a suitable and appropriate investment for the ESOP, but was, instead, an imprudent investment in light of widely available public information.

132.     Nonetheless, during the Class Period, these Defendants continued to permit the ESOP to offer Kodak stock as an investment option and invest in Kodak stock.  They did so despite the fact that they knew or should have known that Kodak was in dire circumstances.

133.     The ESOP Prudence Defendants breached their fiduciary duty respecting the ESOP Plan's investment in Company stock described above, under the circumstances alleged herein, in that a prudent fiduciary acting under similar circumstances would have made different investment decisions and, in particular, would not have permitted the ESOP Plan to invest in Kodak stock.

134.    Given the information described above, the ESOP Prudence Defendants could not possibly have acted prudently when they continued to offer Company stock because, among other reasons:

a.    The ESOP Prudence Defendants knew of and/or failed to investigate the Company's dire circumstances as alleged above.

b.    The risk associated with the investment in Company stock during the Class Period was by far above and beyond the normal, acceptable risk associated with retirement plan investment in Company stock.

135.    Knowing of this extraordinary risk, the ESOP Prudence Defendants had a duty to avoid permitting the ESOP Plan from investing assets in Company stock.

136.    The ESOP Prudence Defendants breached their fiduciary duties by, inter alia, failing to engage independent advisors who could make independent judgments concerning offering Company stock as an option and investing in Company stock; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Company stock an unsuitable investment for the ESOP; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to the Company's dire circumstances; and by otherwise placing their own and the Company's improper interests above the interests of the Participants with respect to the ESOP Plan's investment in Company stock.

137.    As a consequence of the ESOP Prudence Defendants' breaches of fiduciary duty alleged in this Count, the ESOP Plan suffered tremendous losses.  If the Prudence Defendants had discharged their fiduciary duties, the losses suffered by the ESOP Plan would have been

minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary

duty alleged herein, the ESOP Plan, and indirectly Plaintiff and the other Class members, lost

millions of dollars of retirement savings.

138.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2)

and (a)(3), the ESOP Prudence Defendants are liable to restore the losses to the ESOP Plan and

Participants caused by their breaches of fiduciary duties alleged in this Count and to provide

other equitable relief as appropriate.

### Count III Failure to Monitor Fiduciaries

139.    Plaintiff incorporates by reference the allegations above.

140.    This Count alleges fiduciary breach against the Director Defendants and the

SIPCO Defendants (the "Monitoring Defendants").

141.    As alleged above, upon information and belief, during the Class Period the

Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C.

§ 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C.

§ 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and

prudence.

142.    As alleged above, the scope of the fiduciary responsibilities of the Director

Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of

the Committee Defendants.

143.    As alleged above, the scope of the fiduciary responsibilities of the SIPCO

Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of

the Trustee.

144.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

145.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

146.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plans and the plan assets, or that may have an extreme impact on the plans and the fiduciaries' investment decisions regarding the plan.

147.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

a.    failing, at least with respect to the Plans' investment in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock;

b.   failing to ensure that the monitored fiduciaries appreciated the true extent of the risks of investing in the Company stock, and the likely impact of such practices on the value of the Plans' investments in Company stock;

c.   to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets and, in particular, the Plans' investment in the Company stock; and

d.   failing to remove appointees whose performance was inadequate in that they continued to permit the Plans to make and maintain investments in the Company stock despite the practices that rendered Company stock an imprudent investment during the Class Period.

148.   As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

149.   Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C.  §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### Count IV Co-Fiduciary Liability

150.   Plaintiff incorporates by reference the allegations above.

151.     This Count alleges co-fiduciary liability against all Defendants (the "Co-fiduciary Defendants").

152.     As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

153.     As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-fiduciary Defendants breached all three provisions.

154.     Knowledge of a Breach and Failure to Remedy.  ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

155.     In particular, because the Director Defendants knew of the Company's failures and inappropriate business practices, they also knew that the SIP Prudence Defendants and the ESOP Prudence Defendants (collectively, the "Prudence Defendants") were breaching their duties by continuing to invest in Company stock.  Yet, they failed to undertake any effort to remedy these breaches and, instead, compounded them by downplaying the significance of the

Company's failed and inappropriate business practices and obfuscating the risk that the practices posed to the Company, and, thus, to the SIP and ESOP Plans.

156.    Knowing Participation in a Breach.  ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. The Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had actual knowledge of the facts that rendered Company stock an imprudent retirement investment and, yet, ignoring their oversight responsibilities, permitted the Prudence Defendants to breach their duties.  Moreover, as alleged above, each of the Defendants participated in the management of the SIP and ESOP Plan's improper investment in the Fund and, upon information and belief, knowingly participated in the improper management of that investment by the other Defendants.

157.    Enabling a Breach.  ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

158.    The Monitoring Defendants' failure to monitor the Prudence Defendants enabled those Defendants to breach their duties.

159.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the SIP and ESOP Plan, other Participants and beneficiaries, lost millions of dollars of retirement savings.

160.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Co-fiduciary Defendants are liable to restore the losses to the SIP and ESOP Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

161.     The Plans suffered millions of dollars in losses of vested benefits because substantial assets of the Plans were imprudently invested or allowed to be invested by Defendants in the Fund during the Class Period in breach of Defendants' fiduciary duties.

162.     Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA mandated duties of prudence and loyalty, eliminating Company stock as an investment alternative when it became imprudent, and divesting the Plans of Company stock when maintaining such an investment became imprudent, the Plans would have avoided some or all of the losses that they suffered.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

163.     The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above and, therefore, knew or should have known that the Plans' assets should not have been invested in Kodak stock during the Class Period.

164.     As a consequence of the Defendants' breaches, the Plans suffered a significant loss of vested benefits.

165.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary who breaches any of the duties imposed upon fiduciaries to make

good to such plan any losses to the plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

166.    Plaintiff and the Class are therefore entitled to relief from Defendants in the form of:

a.   a monetary payment to the Plans to make good to the Plans the loss of benefits to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

b.   injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3);

c.   reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

d.   taxable costs and interest on these amounts, as provided by law; and

e.   such other legal or equitable relief as may be just and proper.

## CLASS ACTION ALLEGATIONS

167.    To the extent appropriate, Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiffs and the following class of persons similarly situated (the "Class"):

All persons, other than Defendants, who were participants in or beneficiaries of the Plans at any time between January 1, 2010 through and including the present, and whose accounts included investments in Kodak stock or units in a Kodak Stock Fund.

168.    Class Period.  The fiduciaries of the Plans knew or should have known at least by, that the Company's material weaknesses were so pervasive that Company stock could no longer be offered as a prudent investment for retirement Plans.

169.    Numerosity.  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are tens of thousands of Class members, based on the Kodak's Form 5500 Annual Returns filed with the Internal Revenue Service ("IRS") and dated January 14, 2011, (listing 34,436 Participants in the SIP for the plan year beginning December 31, 2009, and ending December 30, 2010) and September 29, 2011 (listing 15,095 Participants in the ESOP Plan for the plan year beginning January 1, 2010, and ending December 31, 2010).

170.    Commonality.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

b.   whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;

c.   whether Defendants violated ERISA; and

d.   whether the Plans suffered losses and, if so, what is the proper measure of damages.

171.    Typicality.  Plaintiff's claims are typical of the claims of the members of the

Class because:  (a) to the extent Plaintiff seeks relief on behalf of the Plans pursuant to ERISA

 § 502(a)(2), their claims on behalf of the Plans are not only typical of, but identical to claims

under this section brought by any Class member; and (b) to the extent Plaintiff seeks relief under

ERISA § 502(a)(3) on behalf of himself for equitable relief, that relief would affect all Class

members equally.

172.    Adequacy.  Plaintiff will fairly and adequately protect the interests of the

members of the Class and has retained counsel competent and experienced in class action,

complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those

of the Class.

173.    Rule 23(b)(1)(B) Requirements.  Class action status in this ERISA action is

warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the

Class would create a risk of adjudications with respect to individual members of the Class which

would, as a practical matter, be dispositive of the interests of the other members not parties to the

actions, or substantially impair or impede their ability to protect their interests.

174.    Other Rule 23(b) Requirements.  Class action status is also warranted under the

other subsections of Rule 23(b) because: (a) prosecution of separate actions by the members of

the Class would create a risk of establishing incompatible standards of conduct for Defendants;

(b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect

to the Class as a whole; and (c) questions of law or fact common to members of the Class

predominate over any questions affecting only individual members, and a class action is superior

to the other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.      A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.      An Order compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including loss of vested benefits to the Plans resulting from imprudent investment of the Plans' assets; to restore to the Plans all profits the Defendants made through use of the Plans' assets; and to restore to the Plans all profits which the Plans and participants would have made if Defendants had fulfilled their fiduciary obligations;

C.      Imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligation;

E.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in Company stock;

F.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.      An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

Dated:  February 16, 2012

BLITMAN & KING LLP


By: /s *Jules L. Smith*
Jules L. Smith
The Powers Building, Suite 500
16 West Main Street
Rochester, New York 14614
Telephone: (585) 232-5600
Facsimile: (585) 232-7738
Email: jlsmith@bklawyers.com


Robert A. Izard
Mark P. Kindall
Nancy A. Kulesa
IZARD NOBEL LLP
29 South Main Street, Suite 215
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile:  (860) 493-6290
rizard@izardnobel.com
mkindall@izardnobel.com
nkulesa@izardnobel.com

Attorneys for Plaintiff and the Class